1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK
_____
UNITED STATES OF AMERICA

vs.                     1:21-cr-154

KRISTOFER LANDELL,

                    Defendant.


_____



     Transcript of a Change of Plea held on June 8,

2021, at the Federal Building and Courthouse, 15 Henry

Street, Binghamton, New York, the HONORABLE THOMAS J.

McAVOY, Senior District Judge, Presiding.



               A P P E A R A N C E S

For The Government:  UNITED STATES ATTORNEY'S OFFICE
                       BY: TODD GLEASON, ESQ.
                          GARY DONNER, ESQ.
                           Assistant U.S. Attorneys

For Defendant:       OFFICE OF FEDERAL PUBLIC DEFENDER
                       BY:  MATTHEW TRAINOR, ESQ.



               *Ruth I. Lynch, RPR, RMR, NYSRCR*
                 *Official United States Court Reporter*
                    *Binghamton, New York  13901*

2

1          THE CLERK:  United States of America versus
2   Kristofer Landell, 1:2021-CR-154.
3          Can we please have the appearances for the
4   record?
5          MR. GLEASON:  Todd Gleason and Gary Donner
6   for the United States.  Good morning, your Honor.
7          THE COURT:  How are you?
8          MR. GLEASON:  Very good.
9          THE COURT:  Mr. Gleason, is that you?
10          MR. GLEASON:  I'm Mr. Gleason, this is
11   Mr. Donner.
12          THE COURT:  I got the two of you confused.
13          MR. DONNER:  Good morning, your Honor.
14          THE COURT:  I've only seen you five times
15   before.
16          MR. GLEASON:  Right.
17          THE COURT:  All right.  How about who's
18   appearing for the defendant, Mr. Landell?
19          MR. TRAINOR:  Matthew Trainor, here on
20   behalf of Kristofer Landell, seated to my left.
21          THE COURT:  Good morning, Mr. Trainor.
22          Good morning, Mr. Landell.
23          THE CLERK:  Will the defendant please rise?
24          Will you raise your right hand?
25          (The witness was duly sworn.)

3

1          K R I S T O F E R   L A N D E L L ,

2          having been called as a witness, having

3          been duly sworn, testified as follows:

4          THE COURT:  Now, Mr. Gleason and Mr. Donner

5   and Mr. Trainor, I have a note on my file indicating

6   that the parties have advised that they will be

7   waiving the reading of the entire information and they

8   would state that on the record as well.

9          So, Mr. Gleason, Mr. Donner, what's your

10  position on that?

11         MR. GLEASON:  You are absolutely correct, we

12  waive; we've advised that we don't need the

13  information read into the record.

14         And my understanding is that Mr. Trainor has

15  gone over the information with his client and that

16  they would waive as well.

17         THE COURT:  Mr. Trainor, what's your

18  position?

19         MR. TRAINOR:  As Mr. Gleason said, your

20  Honor, we would also waive reading of the information

21  today.

22         THE COURT:  Mr. Landell, you understand

23  what's going on here?

24         THE DEFENDANT:  Yes, I do.

25         THE COURT:  The accusations as to what you

4

1    did or didn't do in connection with the asbestos

2    removal problems are contained in a document which is

3    called an information.  That's prepared by the

4    government, and that contains a list of what

5    effectuates your conduct in this case that constitutes

6    the criminal activity charged.  And ordinarily what

7    happens is we come in, and the attorney -- the

8    attorney doesn't do it but I have the clerk read the

9    information, and then you're asked if you plead guilty

10   or not guilty.  And we're going to do the same thing

11   today, except what they want to do is not read the

12   entire information.  And the reason for that, I take

13   it, is because it's lengthy; it is written in English,

14   I'll give them that much, but that's -- that's about

15   all.  Because it's completely, well, I don't know.

16   But it's -- it's a little bit lengthy.

17          And I think it's critical that I ask you, do

18   you understand what the information charges you with?

19          THE DEFENDANT:  Yes, your Honor, I do.

20          THE COURT:  And have you talked that over

21   with Mr. Trainor?

22          THE DEFENDANT:  Yes.

23          THE COURT:  Yes?

24          THE DEFENDANT:  Yes.

25          THE COURT:  Did he explain it to you?

5

1          THE DEFENDANT:  Yes, he did.

2          THE COURT:  Do you feel comfortable agreeing

3   to saying what's in -- what's in the information is

4   the conduct that you did in connection with this

5   asbestos removal project?

6          THE DEFENDANT:  Yes, your Honor, I do.

7          THE COURT:  All right.

8          All right, well, the Court's -- I don't know

9   how the Circuit's going to look at this, but I'll take

10  a chance and agree to proceed that way.  Because it

11  makes sense to me, Mr. Landell sounds to me like he

12  knows what he's talking about.  And he tells me he

13  understands what's in the information, and he agrees

14  that that is what his conduct was.  Based on that,

15  I'll accept the agreement between counsel not to read

16  the entire information and to save the lives of the

17  clerk and the stenographer.

18          Now, let's move from that to the plea

19  agreement.  This plea agreement is no different than

20  the ones that we've been working with with the last

21  two or three defendants.  But there's nothing in this

22  plea agreement that waives the right to a certain

23  sentence in terms of months.  And is there a reason

24  for that?

25          MR. GLEASON:  My understanding is this plea

6

1  agreement is identical to the others insofar as the --

2  the defendant is waiving certain appellate rights and

3  collateral attack rights with the exception of

4  ineffective assistance of counsel along with a couple

5  other things, but more importantly what I think the

6  Court is alerted to is he's waiving the right to

7  appeal provided the sentence is no greater than the

8  advisory guidelines range that would be calculated in

9  this particular case.  And we have -- I will go over

10  that at the appropriate time.  We do have a rough

11  guidelines calculation.

12         THE COURT:  Right.

13         MR. GLEASON:  And we have stipulated

14  provisions, but that's the --

15         THE COURT:  Okay.

16         MR. GLEASON:  -- government's understanding

17  of the waiver of appellate rights in this particular

18  case.  And those are laid out in -- pardon me, in

19  paragraph 7 of the plea agreement.  On page 18 that's

20  paragraph 7A and B.

21         THE COURT:  All right.  Thank you for

22  explaining that to me.

23         Mr. Landell, would you please state your

24  full name?

25         THE DEFENDANT:  It's Kristofer Stephen

                                                            7

1    Landell.

2              THE COURT:  And how old are ya?

3              THE DEFENDANT:  I'm 36.

4              THE COURT:  What's your date of birth?

5              THE DEFENDANT:  October 21st, 1984.

6              THE COURT:  Are you married?

7              THE DEFENDANT:  Yes, I am.

8              THE COURT:  Do you have any children?

9              THE DEFENDANT:  I do.

10             THE COURT:  How many?

11             THE DEFENDANT:  One.

12             THE COURT:  And is it a boy or a girl?

13             THE DEFENDANT:  It's a boy.

14             THE COURT:  How old is he?

15             THE DEFENDANT:  He's eight years old.

16             THE COURT:  All right.  How far did you go

17   in school?

18             THE DEFENDANT:  I have a bachelor's degree.

19             THE COURT:  And what kind of work have you

20   done over the years?

21             THE DEFENDANT:  Anything from substitute

22   teaching, I went into business doing asbestos, I've

23   worked just through college, like grocery stores.

24   Things like that.

25             THE COURT:  All right.  Have you had any

8

```
1    alcohol or narcotics in the past 24 hours?

2              THE DEFENDANT:  No, I have not.

3              THE COURT:  Are you currently or have you

4    recently been under the care of any physician,

5    psychiatrist, or other medical care provider for any

6    physical or mental condition?

7              THE DEFENDANT:  No, I have not.

8              THE COURT:  Are you taking any medication at

9    the present time?

10             THE DEFENDANT:  No.

11             THE COURT:  Did the Court assign Mr. Trainor

12   to represent you?

13             THE DEFENDANT:  Yes.

14             THE COURT:  Has he advised you of the

15   content of the charge in the information?

16             THE DEFENDANT:  Yes.

17             THE COURT:  And you told me a few moments

18   ago that you understood that.  Was that true?

19             THE DEFENDANT:  Yes.

20             THE COURT:  All right.  In a few moments I'm

21   going to ask you some additional questions.  But first

22   I want to talk to you about waiving your right to

23   indictment.  And in order to be convicted of a federal

24   felony, you have to either be convicted after trial,

25   with the jury making a decision, or the Court is -- a
```

9

1   Court trial only, or you could be indicted by a grand

2   jury and then plead guilty to -- to the indictment

3   charged, or in this case you can waive, or give up,

4   your right to indictment and proceed to plead to the

5   U.S. Attorney's information just as though you had

6   been indicted.

7            Did you talk to Mr. Trainor about waiving,

8   or giving up, your right to indictment by a grand

9   jury?

10            THE DEFENDANT:  Yes, your Honor.

11            THE COURT:  Do you know that you do have a

12   right to have this matter presented to and considered

13   by a grand jury and have them indict you?

14            THE DEFENDANT:  Yes.  Yes, I -- I understand

15   that.

16            THE COURT:  Okay.  Has anybody made any

17   promises to you or threats against you to induce you

18   to waive indictment?

19            THE DEFENDANT:  No.

20            THE COURT:  Do you wish to waive your right

21   to indictment?

22            THE DEFENDANT:  Yes, I do.

23            THE COURT:  Mr. Trainor, do you see any

24   reason why Mr. Landell should not waive his right?

25            MR. TRAINOR:  No, your Honor, I don't.

10

1          THE COURT:  All right, the Court will find

2     the waiver was made knowingly and voluntarily and will

3     accept the waiver.

4          Now, as I indicated before, I'm going to be

5     asking you a few additional questions in order to

6     learn if you're pleading guilty freely and

7     voluntarily, with an understanding of the charge and

8     the consequences.

9          I'm going to be asking you if anybody has

10    made any promises of leniency to you to induce you to

11    plead guilty or threatened you with the use of force

12    to induce you to plead guilty.

13          I'm going to be listening to something about

14    what you did in this case so the Court can establish

15    that there's a factual basis for accepting and

16    entering your plea, and I'm going to ask you to

17    reaffirm the information you just gave me about your

18    personal history and background.  And I want to advise

19    you that if your answers are not truthful, they may

20    later be used against you in a prosecution for

21    perjury, or making a false statement.  Do you

22    understand that?

23          THE DEFENDANT:  Yes, I do, your Honor.

24          THE COURT:  Before I ask you these

25    additional questions and before the clerk takes your

11

1    plea, I want to advise you of some rights that you

2    have in connection with this matter.

3            First of all, you have the right to persist

4    in your original plea of not guilty.

5            You have the right to a speedy and a public

6    trial by an impartial jury of 12 persons or to a trial

7    by the Court alone, if you were to waive, or give up,

8    your right to a jury trial.  At such a trial you would

9    have the right to the assistance of an attorney.  You

10   would have the right to confront, that is to see and

11   hear, any witnesses sworn against you and to

12   cross-examine them.  You would have the right to

13   remain silent or to testify in your own behalf, but

14   you couldn't be compelled to incriminate yourself or

15   to testify at all, and your silence could not be held

16   against you in any way, nor could any inferences of

17   guilt be drawn against you if you decided not to

18   testify.

19           You have the right to use a subpoena or

20   other processes of the Court to compel witnesses to

21   attend the trial and testify and to obtain any

22   documentary or other evidence you might wish to offer

23   in your own defense.

24           Now, if the Court accepts your plea of

25   guilty here this morning, there won't be a trial of

12

1    any kind, and the Court will have the same power to

2    sentence you as if you had been found guilty after a

3    trial on the information to which you're pleading.

4                Now, you told me, this is the third time I'm

5    asking you this.  You told me that you talked to

6    Mr. Trainor about what the charge in the information

7    meant and that you understood it.  Is that true?

8                THE DEFENDANT:  Yes, that's true.

9                THE COURT:  Did you talk to Mr. Trainor

10   about the potential sentences or consequences of

11   pleading guilty?

12               THE DEFENDANT:  Yes, your Honor, I did.

13               THE COURT:  Did he explain those to you?

14               THE DEFENDANT:  Yes.

15               THE COURT:  Do you understand them?

16               THE DEFENDANT:  Yes.

17               THE COURT:  Did you talk to him about your

18   chances of winning or losing if you decided to go to

19   trial, trial strategy, and defenses?

20               THE DEFENDANT:  We touched on that briefly,

21   yes.

22               THE COURT:  I'm sorry?

23               THE DEFENDANT:  We -- we went over that

24   briefly, yes.

25               THE COURT:  So do you understand those

1    rights?

2              THE DEFENDANT:  Yes.

3              THE COURT:  Lastly I want to warn you that

4    your plea of guilty constitutes a waiver, or giving

5    up, of your right against self-incrimination, and I

6    want to warn you not to plead guilty unless you are in

7    fact guilty of the charge made against you in the

8    information.

9              Do you still wish to plead guilty?

10             THE DEFENDANT:  Yes, your Honor.

11             THE COURT:  So now the parties have agreed,

12   attorneys have agreed, I guess, not to read the entire

13   information.  So does somebody want to make a quick

14   recitation of the content of the information, or how

15   we going to do it?

16             MR. GLEASON:  I'd be happy to do so, your

17   Honor.

18             As you said, the allegations are laid out

19   largely in the information but there's also a fairly

20   robust factual allocution in the plea agreement itself

21   that covers much of the same content.  Specifically

22   that's set forth in paragraph 5 on pages 4 through 16,

23   in addition to what's set forth in the information.

24             So if this case were to come to trial, your

25   Honor, the United States would prove with documents,

14

1  testimony, photographs, and other evidence the follows

2  facts beyond a reasonable doubt:

3          Specifically that the defendant was what was

4  known as an asbestos air and project monitor, which is

5  slightly different than what we've dealt with so far,

6  your Honor.  He, like others, was also licensed by the

7  State of New York to carry out such activities in

8  connection with asbestos work.  He received accredited

9  training and passed a written test to get that

10 certification.  That training touched on a number of

11 different areas.  Project monitors get probably some

12 of the most robust training in this regard, and I'll

13 get to that in just a moment, but they cover both

14 federal and state law.  The state law, state

15 regulations relevant to asbestos, are colloquially

16 referred to as Code Rule 56.  You may have heard that

17 in the past, your Honor.  But specifically what that

18 training touched on was the identification of what's

19 known as suspect asbestos containing material, bulk

20 and air sampling, and the analysis of such materials;

21 which was a big part of this particular defendant's

22 job.

23          The requirements were remove all regulated

24 asbestos containing materials, which I'll refer to as

25 RACM from this point forward, R-A-C-M, and that it

15

1   must be removed prior to any renovation or demolition

2   activities.

3            And likewise I will also stop here and say

4   for the court reporter's purposes if I'm going too

5   quickly through this, please just let me know.  I know

6   I have a tendency to speak way too fast.

7            The defendant also was trained on the

8   preparation of the work area where RACM would be

9   handled and removed, how it would be removed, such as

10  the proper wet removal techniques, disposal

11  requirements, air monitoring practices, and then

12  worker protection in the form of personal protective

13  equipment like masks, suits, respirators, that sort of

14  thing.

15           The evidence would show the defendant was

16  the owner of an air and project monitoring company

17  known as Hudson River Valley Environmental, or HRVE;

18  and that as an air and project monitor, the defendant

19  and his company were responsible for a number of

20  items, not the least of which was remaining on-site at

21  all times to observe the removal that was going on,

22  conducting various types of sampling throughout the

23  duration of that project, particularly air sampling;

24  maintaining air and project monitor sample logs and

25  other paperwork required under Code Rule 56; regularly

16

1   calibrating and checking the air monitoring equipment

2   to make sure that it was actually giving accurate

3   results; and then conducting what's known as a final

4   visual inspection or final air clearance after the

5   abatement work was completed to make sure that the

6   area was safe to be reinhabited.

7          The defendant also contractually obligated

8   himself to Tech City and DOL through what's known as a

9   variance under the code rule.  And under the terms of

10  this particular variance, he was obligated to ensure

11  compliance with asbestos regulations and prevent

12  visible emissions during the work of this project.

13  Notwithstanding these obligations, the defendant --or,

14  pardon me, there's also one other obligation that the

15  air and project monitoring company cannot have a

16  financial entanglement or any relationship with the

17  abatement workers he was monitoring, which makes

18  sense.  Sort of a prohibition against the fox watching

19  the henhouse, I suppose.

20          Notwithstanding these obligations, the

21  defendant did financially entangle himself with A2

22  Environmental Services, which was the company he was

23  monitoring.  Specifically its owner transferred more

24  than $13,000 to the defendant, and his name appeared

25  on other documents associated with A2.

17

1        The defendant conducted what's known as an

2   asbestos survey of the site in question, and he

3   documented there was more than 665,000 square feet of

4   RACM and 6,000 linear feet of RACM throughout 11

5   buildings on-site.  The jurisdictional threshold, as I

6   think I've explained in the past, your Honor, are 260

7   and 160 feet respectively.  So he himself documented

8   this was well over the federal jurisdictional

9   threshold.

10       In or around July 2015 both HRVE and A2

11  executed what's known as contract number 1, with Tech

12  City, to provide both air and project monitoring

13  services, as well as the abatement work.  HRVE's

14  specific contract was only for the project monitoring

15  and air monitoring and was roughly $30,000.

16       Between November 2015 and March 2016

17  abatement work did proceed at the site with the

18  defendant and his company providing that air and

19  project monitoring.  And during that same time DOL,

20  the New York State Department of Labor, conducted

21  inspections and issued seven notices of violation in

22  connection with both HRVE and A2 personnel violating

23  both state and federal asbestos regulations.

24       The last of the NOVs in the contract

25  number 1 occurred on or about March 1st, 2016, where

18

1   New York State DOL found RACM not properly

2   containerized, the decontamination unit not properly

3   sealed off to the outside air, and abatement workers

4   there without licenses.  Also they were not handling

5   RACM waste.  Most troubling here, the final air

6   clearance prepared in conduction with the activities

7   on or about that time period was prepared by HRVE and

8   sent to New York State Department of Labor, and it's

9   one of the very few that actually did occur; there

10  were very few final air clearances, based on our

11  investigation.  But this was purported to have been

12  conducted by an individual that I'll refer to as SP

13  for the purposes of this plea.  But during our

14  investigation, and we would be prepared to prove

15  beyond a reasonable doubt, that this is an individual

16  that actually never worked at the site.

17          A2 was discharged from the site on or about

18  March 2016.  HRVE remained in Tech City's employ

19  throughout the entirety of the project.  A2 did

20  renegotiate a second contract at this point, and work

21  resumed.

22          Between May and August 2016 again A2 and

23  HRVE were providing services on-site.  New York State

24  Department of Labor again issued a series of NOVs

25  during this time period.  And during the same time

1  period at least one HRVE employee reported that

2  Mr. Landell personally authorized the breakdown of

3  contaminant without properly conducting a final air

4  clearance.  And that's contained at paragraph 5X on

5  page 134 of the plea agreement.

6            The site was shut down on or about

7  August 1st, 2016, when again DOL discovered evidence

8  of extensive violations to include dry removal and

9  work occurring outside the contamination area.

10            When asked both by New York State inspectors

11  and EPA personnel, no one from either A2 Environmental

12  Services or the defendant's company, HRVE, was able to

13  provide a complete copy of many of the records that

14  are required to be maintained by New York State

15  Department of Labor.

16            The United States also seized extensive

17  email records showing Mr. Landell's email and Miss

18  Laskin saying things throughout this process like

19  quote/unquote, paperwork is very important, it's more

20  than just writing things down, you need certain things

21  in your log for the code rule, but you also don't want

22  to put too much in them, closed quote.

23            So the United States would be prepared to

24  prove all of those facts beyond a reasonable doubt,

25  your Honor, and those are the allegations that are

20

1   substantially contained both in the plea agreement and

2   in the information which we alluded to.

3            THE COURT:  All right.  Mr. Landell, did you

4   hear and understand what Mr. Gleason said about what

5   you did or didn't do in this case?

6            THE DEFENDANT:  Yes, your Honor, I did.

7            THE COURT:  Is that all right, correct?

8            THE DEFENDANT:  Yes, it's all correct.  I

9   mean their time, time is all.

10           THE COURT:  So you're pleading guilty.  Is

11  that right?

12           THE DEFENDANT:  Yes, your Honor.

13           THE COURT:  Mr. Trainor, is that your

14  understanding as well?

15           MR. TRAINOR:  It is, your Honor.  And as

16  Mr.  Gleason pointed out, the plea agreement was a

17  formally negotiated description, it goes on for many

18  pages, and it has much more detailed information

19  related to my client's conduct in particular.

20           THE COURT:  All right.  Okay.  Now, Mr. --

21  Mr. Landell, did Mr. Trainor advise you of your rights

22  in this case?

23           THE DEFENDANT:  Yes, your Honor, he did.

24           THE COURT:  Is there anything you'd like to

25  ask me about your rights this morning?

21

1          THE DEFENDANT:  No, your Honor.

2          THE COURT:  Are you satisfied with what

3     Mr. Trainor has done for you so far?

4          THE DEFENDANT:  Yes.

5          THE COURT:  Has Mr. Trainor or Mr. Gleason

6     or Mr._Donner or any public official or anyone made

7     any promises to you that you'd be treated leniently in

8     exchange for your plea of guilty?

9          THE DEFENDANT:  No.

10          THE COURT:  Has anybody threatened you with

11     the use of force to induce you to plead guilty?

12          THE DEFENDANT:  No.

13          THE COURT:  Are you pleading guilty freely

14     and voluntarily?

15          THE DEFENDANT:  Yes.

16          THE COURT:  Are you currently on probation

17     from any other court or parole from any institution?

18          THE DEFENDANT:  No.

19          THE COURT:  All right.  This is the part

20     where I would ask the government to recite what it

21     knew about your conduct in this case, but it's already

22     done that, and you acknowledged that that was the

23     case.  So we won't do that again.  It would be

24     redundant and I don't believe necessary.  But what I

25     will do is ask Mr. Gleason to advise you and the Court

1   what the maximum penalty would be for the count

2   involved.

3          MR. GLEASON:  Absolutely, your Honor.

4   Again, these are also set forth in the plea agreement

5   on page 3 paragraph 3, but in summary form, the

6   maximum penalties for a violation of 18 United States

7   Code Section 371, which I can go over the elements,

8   your Honor, but the penalties here are a maximum of 5

9   years incarceration pursuant to 18 United States

10  Code 371.  3 years supervised release pursuant to 18

11  United States Code 3583 subsection B(2).  1 to 5 years

12  probation alternatively pursuant to 18 United States

13  Code 3561(C)(1).  A fine of $250,000 or twice the

14  pecuniary loss or gain pursuant to 18 United States

15  Code Section 3571.  Special assessment of $100

16  pursuant to 18 United States Code 3013

17  subsection A(2)A.

18          I also will add in this particular case

19  restitution will be at play in the sentencing

20  proceedings pursuant to United States Code 3553(A).

21  As I think I've alluded to in prior plea hearings,

22  your Honor, the cleanup costs will be a substantial

23  portion of the restitution the Government is seeking,

24  specifically those incurred by the EPA.  The current

25  estimated, and they are estimated, cleanup costs at

23

1    the site are roughly 1.3 million based on the most

2    recent figures I've seen.  And we can go into that in

3    much more detail at sentencing.  I won't do it here.

4          The other thing I will hasten to add is with

5    respect to, although it's not a maximum or minimum

6    penalty, the plea agreement does discuss collateral

7    consequences beyond those that you would normally see

8    in a standard plea agreement.  As a special condition

9    that the parties have agreed to, the defendant will be

10   giving up some licensing privileges to work in the

11   asbestos industry in New York.  Likewise, your Honor,

12   there may be implications beyond what we can predict,

13   meaning you, me, the defendant, anybody, at this time,

14   on things like permits, licensure, contracting, things

15   like that.

16         Those are the -- those are the maximum

17   penalties, your Honor.

18         THE COURT:  All right, Mr. Landell.  In

19   addition to what Mr. Gleason has told you, the Court

20   also must advise you that if it were to sentence you

21   to a period of incarceration followed by a period of

22   supervised release, if you violate any of the terms

23   and conditions of that release you'd be subject to a

24   further term of imprisonment.  And although it's not

25   mentioned, conviction of a felony also would prevent

24

1 you from possessing firearms or, in some

2 jurisdictions, voting. That's not true in all

3 jurisdictions.

4          Also, under and pursuant to certain

5 sentencing guidelines adopted by the United States

6 which used to be mandatory but are no longer mandatory

7 but still must be considered by the Court in the

8 sentencing process, my discretion in sentencing you is

9 thereby affected and the Court must enforce the law as

10 it stands today. But sometimes the Court can sentence

11 you above the guidelines or below the guidelines or

12 even outside the guidelines, depending upon the facts,

13 the circumstances, and the law that's presented to the

14 Court at or about the time of sentencing.

15          So you understand what I just said about the

16 guidelines?

17          THE DEFENDANT: Yes, your Honor.

18          THE COURT: Have you done a preliminary

19 guideline calculation, Mr. Gleason?

20          MR. GLEASON: We have, your Honor. And the

21 parties have agreed to certain stipulated provisions

22 of those guidelines.

23          THE COURT: Okay.

24          MR. GLEASON: Specifically those set forth

25 in paragraph 6A on page 17 of the plea agreement.

1          Based on our estimate, the total offense

2    level after acceptance would be 17.  Assuming the

3    defendant was a category I offender, your Honor, that

4    would give an advisory guidelines terms of

5    incarceration of 24 to 30 months.

6          This is how we got there.  The base would be

7    prescribed by Section 2(Q)1.2 of the guidelines, that

8    would rate it a base of 8.  The parties have agreed

9    that the application of a 6-point enhancement under

10   the repetitive release provision is appropriate under

11   the 2(Q)1.2 subsection B(1)(A); that there were

12   substantial clean-ups which would add another 4 points

13   pursuant to 2(Q)1.2 subsection B(3); that the

14   defendant used a special skill, which requires another

15   2-point addition; and then the defendant through his

16   acceptance would be entitled to 2 to 3 points off.

17          Again, as you've already stated, your Honor,

18   these are obviously just estimates at this point until

19   we see a presentence investigation report and other

20   facts that come prior to sentencing.

21          THE COURT:  All right.  Mr. Landell, did you

22   sign your plea agreement in this case?

23          THE DEFENDANT:  I'm sorry?

24          THE COURT:  Did you sign your plea

25   agreement?

1           THE DEFENDANT:  Yes, I did, your Honor.

2           THE COURT:  Did you talk it over with your

3    attorney before you signed it?

4           THE DEFENDANT:  Yes, I did.

5           THE COURT:  Did he explain it to you?

6           THE DEFENDANT:  Yes.

7           THE COURT:  Did you understand it when you

8    signed it?

9           THE DEFENDANT:  Yes, I did.

10           THE COURT:  Now, in your plea agreement,

11    according to the government, although I'm not quite

12    sure I can find it, it's got to be in here someplace,

13    you've agreed to give up certain appeal rights in this

14    case.  And some of them were articulated by

15    Mr. Gleason, but can you now articulate for us what

16    appeal rights Mr. Landell is waiving by signing this

17    plea agreement?

18           MR. GLEASON:  Yes.  And I think the -- the

19    provision you're looking for, your Honor, is on

20    page 17 of the plea agreement, paragraph 7.

21           THE COURT:  Okay.

22           MR. GLEASON:  And as you mentioned, there is

23    a -- there are both appellate and collateral attack

24    waivers contained in that paragraph.  And as I

25    explained before, your Honor, the defendant is waiving

27

1   his right to direct appeal of any sentence, and

2   conviction, as well as collateral attack rights, with

3   the exception of ineffective assistance of counsel and

4   malicious prosecution.  He is also waiving his right

5   to appeal a sentence with the exception of any

6   sentence that is above the advisory guidelines range

7   as calculated at the sentencing by this Court.  Not

8   what I just laid out but what would occur at the

9   sentencing.  So for instance, your Honor, if our

10  estimate was correct, and the advisory term was 24 to

11  30 months, if the defendant received a sentence of

12  anything less than 30 months, there would be a waiver

13  in that case.  Beyond that there wouldn't be.

14          THE COURT:  All right.

15          MR. GLEASON:  And then I can also recite

16  some of the other key terms of the plea agreement if

17  you'd like.  Otherwise I can sit down.

18          THE COURT:  Okay.  All right, Mr. Landell,

19  did you understand what you were doing when you agreed

20  to give up the appeal rights that Mr. Gleason just

21  mentioned?

22          THE DEFENDANT:  Yes, I did.

23          THE COURT:  And did you do that voluntarily?

24          THE DEFENDANT:  Yes.

25          THE COURT:  Okay.  Was the plea agreement

28

1   signed by Mr. Donner and Mr. Gleason on behalf of the

2   government?

3           MR. GLEASON:  It was, your Honor.

4           THE COURT:  And, Mr. Trainor, did you sign

5   on behalf of Mr. Landell?

6           MR. TRAINOR:  Well, your Honor, Mr. Landell

7   signed the document, I also signed it.

8           THE COURT:  All right.  Now, Mr. Landell,

9   the Court also has to advise you that it's not bound

10  by any sentencing recommendation contained in the plea

11  agreement, and you'll have no right to withdraw your

12  plea of guilty if the Court decides not to accept any

13  nonbinding recommendation.  The Court will, of course,

14  defer, or put off, its decision to accept or reject

15  any recommendation in the agreement until I have seen

16  the presentence investigation report and any other

17  materials that are forwarded to me that bear on

18  sentencing.

19          So you understand what I just said about the

20  Court's ability to reject any nonbinding

21  recommendation in the plea agreement?

22          THE DEFENDANT:  Yes.

23          THE COURT:  All right.  Now that you've

24  heard about the potential statutory sentence in the

25  guidelines, do you still wish to plead guilty?

                                                                29

1           THE DEFENDANT:  Yes, your Honor.

2           THE COURT:  And are you pleading guilty

3   because you are guilty?

4           THE DEFENDANT:  Yes, your Honor.

5           THE COURT:  Mr. Trainor, would you state

6   your background and experience in handling cases of

7   this kind?

8           MR. TRAINOR:  Well, your Honor, I was

9   admitted to the practice of law in 2001, practicing

10  criminal law mostly in state courts.  In 2015 I joined

11  the federal public defenders office and have been

12  practicing exclusively in Federal Court since that

13  time.  I've had a number of cases that involve a

14  variety of crimes.  I'll be candid, this is the first

15  time I've handled an asbestos case.  However, I was

16  able to go through the guidelines and discuss

17  everything with my client.

18          THE COURT:  All right.  Approximately how

19  much time have you spent so far defending Mr. Landell

20  in this case?

21          MR. TRAINOR:  Because of the learning curve

22  the total, I actually looked it up, the total amount

23  of time I've spent on this case is over 81 hours.

24          THE COURT:  Have you had what you believe to

25  be adequate discovery of the government's case?

1          MR. TRAINOR:  Yes, your Honor.

2          THE COURT:  Have you advised Mr. Landell of

3  his rights, the nature of the charge, and the

4  consequences of pleading guilty?

5          MR. TRAINOR:  I have.

6          THE COURT:  Except what's contained in the

7  plea agreement, have you made any promises or threats

8  to induce him to plead guilty?

9          MR. TRAINOR:  No, your Honor.

10          THE COURT:  Are you satisfied that he is

11  pleading guilty freely and voluntarily with an

12  understanding of the charge and the consequences?

13          MR. TRAINOR:  Yes, your Honor.

14          THE COURT:  Do you know of any defenses that

15  he has that would prevail if the case went to trial?

16          MR. TRAINOR:  No, your Honor.

17          THE COURT:  Do you know of any reason he

18  should not plead guilty?

19          MR. TRAINOR:  No, your Honor.

20          THE COURT:  All right.  Based on the

21  foregoing, the Court will find that Mr. Landell pled

22  guilty freely and voluntarily; that he is and was

23  competent to enter such a plea; that he understands

24  the charges against him and the consequences of

25  pleading guilty; that there is and was a basis in fact

31

1   for the Court accepting and entering a plea.

2          The Court will direct the probation

3   department to prepare and submit a presentence report.

4   The Court will set sentencing for Wednesday,

5   October 6th, 2021, at 10 a.m. in Binghamton, New York.

6          Is there anything further from the

7   government?

8          MR. GLEASON:  No, your Honor.

9          THE COURT:  And defense counsel?

10         MR. TRAINOR:  Nothing further, your Honor.

11         THE COURT:  I see there's a recommendation

12   from pretrial services that based upon the information

13   it provided to the Court that the Court was advised

14   that Mr. Landell should be allowed to continue to

15   remain released on a personal recognizance bond

16   without any pretrial supervision.  Right?

17         MR. TRAINOR:  That is my understanding, your

18   Honor.

19         THE COURT:  So ordered.

20         Court stands adjourned in this matter.

21                    - - - - -

22

23

24

25

                                                                32

1                CERTIFICATE OF OFFICIAL REPORTER

2

3

4         I, RUTH I. LYNCH, RPR, RMR, NYS Realtime

5   Certified Reporter, Federal Official Court Reporter,

6   in and for the United States District Court for the

7   Northern District of New York, DO HEREBY CERTIFY that

8   pursuant to Section 753, Title 28, United States Code,

9   that the foregoing is a true and correct transcript

10  of the stenographically reported proceedings held in

11  the above-entitled matter and that the transcript page

12  format is in conformance with the regulations of the

13  Judicial Conference of the United States.

14

15

16           Dated this 4th day of October, 2021.

17

18       By__*Ruth I. Lynch, RMR*_____

19           RUTH I. LYNCH, RPR, RMR, NYSRCR
             Official U.S. Court Reporter
20

21

22

23

24

25